**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Carol Ann GOLDSTEIN,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Toby ROBERTS, Defendant-Appellant.**

**Nos. 75–2207 and 75–2279.**

United States Court of Appeals,
Ninth Circuit.

March 25, 1976.

Rehearing and Rehearing En Banc
Denied June 7, 1976.

OPINION

Before CHAMBERS and KOELSCH, Circuit Judges, and JAMESON,* District Judge.

JAMESON, Senior District Judge:

In a non-jury trial appellants were convicted of conspiracy, in violation of 18 U.S.C. § 371, and fraud by wire in violation of 18 U.S.C. § 1343, through the use of an electronic device which enabled them to re-route long distance telephone calls and avoid being billed for the services.[1] We affirm.

## BACKGROUND

### Telephone Company Investigation

Walter P. Schmidt is a special agent for General Telephone Company with substantial training in electronics. Since the mid 1960s he has worked with the company's security department in the investigation of electronic toll fraud. A common method of perpetrating such fraud is through the use by subscribers of signal generators known as "blue boxes", which emit the multifrequency tones used to activate long distance lines. The caller uses the device by calling a toll free number, known also as an 800 or WATS (Wide Area Telephone Service) number, and then generating the required tones to place the long distance call. As far as the billing system is concerned, the call is coming from the WATS number. In March, 1974 Schmidt was going over the computer print-outs of 800 number calls in order to detect any number dialed an excessive number of times,—a common indication of "blue box" usage. Schmidt observed that one number had been dialed 160 times and that another had been dialed 94 times. These calls resulted in over 30 hours of long distance conversation. Schmidt found that all of the calls had been placed from a rotary phone system listed in the

Edward M. Genson (argued), Chicago, Ill, George R. Milman (argued), Beverly Hills, Cal., for defendants-appellants.

Richard E. Plymale, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

---

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. Specifically, it was charged in the indictment that appellants devised a scheme to defraud the

General Telephone Company of property through the use of an electronic device known as a multifrequency signal generator, commonly referred to as a "blue box".

name of Roberts' business associate and installed in an apartment used by appellant Roberts as a business office.

This indication of blue box usage led Schmidt to place a device called a peg-count meter on Roberts' telephone line. The meter is a cumulative counter which detects and counts the number of 2600 hertz (a universal measurement) tones transmitted over the line. The peg-count meter is useful in blue-box investigations because regular telephones are not equipped to generate 2600 hertz tones, while "blue boxes" duplicate the switching tones that are used between long distance offices. The signal transmitted by the blue box to the long distance trunk-lines is a preliminary step in making the fraudulent call.

The meter was installed from April 4 to May 6, 1974 and indicated that 105 2600 hertz tones had been sent over the line during the period. Relatively certain that a blue box was being used on Roberts' line, Schmidt took the final step in his investigation by attaching a fraud documentation device to the line. This device detects the fraudulent call, prints out the day and time of the call, the originating number and the number called, and automatically records the first 90 seconds of the call. The device was installed on May 6 and removed on May 17 during which time 16 fraudulent phone calls were recorded.

### F.B.I. Investigation

Agent Schmidt turned over the results of his investigation to the Federal Bureau of Investigation through an "investigative summary", describing the investigative procedure, listing the number of fraudulent calls detected, and giving the name of the subscriber in whose name the suspected telephone was listed. The report was referred to the United States Attorney, who issued a grand jury subpoena requiring Schmidt to produce the records, tapes, and documents resulting from the investigation. Upon examining these records, an F.B.I. agent prepared an affidavit for a warrant to search the apartment from which the fraudulent calls were suspected to be originating. On July 25, 1974 a search warrant was issued by the United States magistrate to search the premises.

The warrant was executed on July 30. The apartment turned out to be the offices of a travel agency operated by appellant Roberts in which Goldstein worked as his secretary. When the agents entered the premises they told Goldstein and others inside not to move. Immediately thereafter Goldstein was observed placing an object in her desk drawer. The apartment was searched, and the "blue box", disguised as a calculator, was found on Goldstein's desk. An accessory to the blue box, identified as the object Goldstein was observed hiding, was found in the desk drawer.

### Court Proceedings

On the basis of the material produced by the Telephone Company and the evidence obtained in the search of the travel agency, Roberts and Goldstein were each charged in the indictment with one count of conspiracy to violate 18 U.S.C. § 1343, Fraud by Wire, and three substantive violations of the statute. Defendants moved under Rule 41(f), Fed.R.Crim.P., to suppress all of the evidence resulting from the telephone company's investigation and from the F.B.I. search. Following a hearing the motion to suppress was denied.

Both defendants waived their right to a trial by jury. A large part of the evidence was stipulated by counsel and consisted of testimony presented to the Grand Jury, evidence considered in the hearing on the motion to suppress, and voice exemplars and voice identification testimony from one of the F.B.I. agents assigned to the case. The testimony of several out-of-state witnesses was presented by stipulation, including testimony by one person who recalled receiving one of the fraudulent calls charged in the indictment. The district court, "after reviewing all of the evidence and giving full consideration to the evidence and all its aspects" found Goldstein guilty of all four counts and Roberts guilty of conspiracy and two substantive counts.

## ISSUES ON APPEAL

The numerous issues raised by the respective appellants in separate briefs may be summarized as follows:

(1) whether the telephone company's investigation was constitutionally and statutorily proper under federal law;

(2) whether the search warrant was issued without probable cause;

(3) whether the evidence should have been excluded because it was obtained in violation of state law;

(4) whether the admission of evidence by stipulation of counsel was a violation of the Sixth Amendment;

(5) whether the court erred in failing to require spectographic voice identification of the recorded conversations; and

(6) whether the evidence was sufficient to support the convictions.

## PROPRIETY OF THE INVESTIGATION UNDER FEDERAL LAW

### (a) Legislative and Judicial History

Prior to 1968, 47 U.S.C. § 605 of the Federal Communications Act was the principal federal law pertaining to the interception and disclosure of wire communications. Under § 605 close restrictions were placed on wire tapping and publishing of information obtained through wire interceptions. Despite these restrictions, however, it was held in a number of cases that § 605 did not prohibit a telephone company from monitoring its own lines to protect the integrity of its regular billing. In particular, this court recognized in *Bubis v. United States*, 384 F.2d 643, 648 (9 Cir. 1967), that in the enactment of § 605 Congress did not intend "to deprive communications systems of their fundamental right to take reasonable measures to protect themselves and their properties against the illegal acts of a trespasser". See also *United States v. Beckley*, 259 F.Supp. 567, 571 (N.D.Ga.1965). As ex-

plained in *Hanna v. United States*, 404 F.2d 405, 406–408 (5 Cir. 1968), other sections of the Communications Act imposed an obligation on wire service carriers to prevent theft of their services which could not be met if § 605 were held to bar carriers from conducting fraud investigations using wire taps. Under § 605, therefore, it became well established that a telephone company could monitor and disclose telecommunications on its lines to the extent "reasonably necessary" to protect its property from fraud.[2]

In 1968 Congress enacted the Omnibus Crime Control and Safe Streets Act, which in Title III established detailed rules on the interception of wire communications. Although Title III, 18 U.S.C. § 2510, *et seq.*, prohibited most electronic eavesdropping by governmental officials without prior judicial approval, an exception was made for communication common carriers. 18 U.S.C. § 2511(2)(a) provides:

> "(i) It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: *Provided*, That said communication common carrier shall not utilize service observing or random monitoring except for mechanical or service quality control checks."

At the same time 47 U.S.C. § 605 was amended by excepting wire interception and disclosures "authorized by chapter 119, title 18, United States Code [18 U.S.C. §§ 2510–2520]" from the disclosure limitations in § 605. Discussing the effect of these statutory changes Senate Report

---

2. Other pre-1968 cases holding that 47 U.S.C. § 605 did not prevent interception of fraudulent or illegal communications include: *United States v. Gallo*, 123 F.2d 229 (2 Cir. 1941);

*Casey v. United States*, 191 F.2d 1 (9 Cir. 1951), *rev'd on other grounds*, 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1951); *Sugden v. United States*, 226 F.2d 281 (9 Cir. 1955).

1097, 2 U.S.Code Cong. and Admin.News, p. 2182 (1968), explained:

"Paragraph (2)(a) provides that it shall not be unlawful for an operator of a switchboard or employees of a common carrier to intercept, disclose, or use wire communications in the normal course of their employment while engaged in any activity which is a necessary incident to the rendition of his service or the protection of the rights of property of the carrier. It is intended to reflect existing law (*United States v. Beckley*, 259 F.Supp. 567 (D.C.Ga.1965)). Paragraph (2)(a) further provides that communication common carriers should not utilize service observing or random monitoring except for mechanical or service quality control checks. Service observing is the principle quality control procedure used by these carriers for maintaining and improving the quality of telephone service. Such observing is done by employees known as service observers, and this provision was inserted to insure that service observing will not be used for any purpose other than mechanical and service quality control."

Two cases, *United States v. Clegg*, 509 F.2d 605 (5 Cir. 1975), and *United States v. Shah*, 371 F.Supp. 1170 (W.D.Pa.1974),[3] involving "blue box" prosecutions under factual situations similar to this case, have considered the effect of the 1968 amendments on the right of wire service carriers to monitor telephones in detecting and preventing wire fraud. Both cases, after reviewing the legislative history and case law outlined above, held, as the court stated in *Clegg*, 509 F.2d 612–613, that:

" . . . [W]e feel that it is quite clear and we do hold that § 2511(2)(a), at a

minimum, authorizes a telephone company which has reasonable grounds to suspect that its billing procedures are being bypassed to monitor any phone from which it believes that illegal calls are being placed. If, by the use of a device similar to a TTS 176,[4] it discovers the existence of illegal calls, § 2511(2)(a), again at a minimum, authorizes it to record, audibly, the salutations. Additionally, § 2511(2)(a) allows the telephone company to divulge, at least, the existence of the illegal calls and the fact that they were completed (the salutations) to law enforcement authorities and ultimately to the courts, since such disclosures are a necessary incident to the protection of the company's property rights. As authorized disclosures, such evidence is admissible in court. 18 U.S.C. § 2517(3)."[5]

Despite the legislative history of Title III, and the cases construing the applicable statutes, both before and after 1968, appellants argue that the evidence gathered by the telephone company should have been suppressed. They contend that (1) § 2511(2)(a) is unconstitutional, (2) the investigation was in violation of this section, and (3) the disclosure to the F.B.I. was in violation of 47 U.S.C. § 605.

(b) *Constitutionality of Section 2511(2)(a)*

■ Goldstein argues that § 2511(2)(a), in allowing communications carriers to conduct investigations without prior approval, is an impermissible delegation of authority by Congress to a quasi-governmental agency, granting it authority to violate telephone subscribers' Fourth Amendment rights. Appellant cites *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d

---

**3.** Accord, *United States v. Freeman*, 373 F.Supp. 50 (S.D.Ind.1974); *United States v. De Leeuw*, 368 F.Supp. 426 (E.D.Wis.1974).

**4.** A "TTS 176" is a device similar to the peg-count meter used in the present case to detect and count the number of 2600 hertz tones transmitted on a subscriber's telephone line.

**5.** 18 U.S.C. § 2517(3) provides:

"Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof."

1040 (1967), and *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), which extended the Fourth Amendment to government electronic surveillance activities, as well as several cases on the general subject of searches under the Fourth Amendment. This argument, however, ignores a fundamental principle of constitutional law—that the Fourth Amendment is a constraint on government action rather than on the actions of private individuals. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048, 1050 (1921). Recent decisions of the Supreme Court on the operation of the Fourth Amendment exclusionary rule have emphasized that the objective of that rule is to deter illegal *government* activity. See, e. g., *Harris v. New York*, 401 U.S. 222, 224–225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1, 34 (1971); *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561, 571 (1974). Although communications carriers may sometimes give the appearance of governmental agencies, they in fact are private companies which possess none of the criteria which might make them responsible under the Fourth Amendment as government bodies. See, e. g., *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 723–726, 81 S.Ct. 856, 860–862, 6 L.Ed.2d 45, 51–52 (1961). They are engaged in the protection of their own property rights. As the court noted concerning a similar argument in *United States v. Clegg*, 509 F.2d at 609: "It is only when the government has preknowledge of and yet acquiesces in a private party's conducting a search and seizure which the government itself, under the circumstances, could not have undertaken . . . ." that a Fourth Amendment violation occurs. The Government here in no way participated, directly or indirectly, in the Telephone Company's investigation.[6]

Appellant Roberts advances another constitutional argument against the validity of § 2511(2)(a). He contends that while other statutes pertaining to electronic surveillance activities require agents to minimize their invasions of the suspect's right of privacy, these restrictions are not found in § 2511(2)(a), making it violative of the Equal Protection Clause as well as the Fourth Amendment. As noted *supra*, private action is not proscribed by the Fourth Amendment. In addition, Roberts' argument fails to recognize the manner in which § 2511(2)(a) and pre-1968 § 605 have consistently been interpreted by the federal courts. The courts have based their holdings regarding wire fraud investigations on the proposition that a telephone subscriber is deemed to have consented to the monitoring of his calls when he violates his subscription rights; but the cases have noted, as did this court in *Bubis v. United States*, 384 F.2d at 648, n. 5:

"Disclosure as well as interception [by the telephone company] is limited by the consent reasonably implied; that is, consent to such invasion of the subscriber's privacy as is necessary to protect the telephone company's property."[7]

Accord, *United States v. Clegg*, 509 F.2d at 612; *United States v. Shah*, 371 F.Supp. at 1174. Although specific minimization requirements are not set forth in § 2511(2)(a), it is clear that all wire tapping by the telephone company is subject to close scrutiny by the courts to ensure that the subscriber is not subjected to an unreasonable and overbroad investigation. We believe that Congress acted correctly in leaving to the courts the task of balancing the competing interests of the carrier, the subscriber, and the public in wire fraud investigations. There is no evidence that the investigation here was in any respect unreasonable or overbroad.

---

6. As in *Clegg*, "This is not a case in which the FBI, by secretly (or even unintentionally but effectively) deputizing the telephone company and its investigator, attempted to avoid the restrictions against wiretapping placed upon the government by the Constitution and by statute. Rather, it is the case of a private, statutorily authorized investigation by the employee of a corporation intent upon protecting its property rights". 509 F.2d at 609.

7. In *Bubis*, 384 F.2d at 648, the court reversed a conviction where it was shown that the telephone company had resorted to "unreasonable and unnecessary practices".

**(c)** *Did Investigation Violate Federal Law?*

Appellants next argue that if § 2511(2)(a) is found to be constitutional, the investigation conducted by the telephone company violated its express provisions, as well as the provisions of 47 U.S.C. § 605.

■ Appellants contend first that the proviso at the end of § 2511(2)(a)(i) forbidding "service observing or random monitoring except for mechanical or service quality control checks" is a limitation on the entire statute, making telephone company wiretapping permissible only to maintain proper service and thus prohibiting the monitoring of customer lines. Appellants point for support to the Senate Report quoted *supra,* which they note cites *United States v. Beckley, supra,* involving employee fraud, as "the existing law" which the statute intends to reflect. Appellants read the statute and the Report too narrowly. The Senate Report distinguishes between monitoring for subscriber fraud and random service monitoring, which it characterizes as a "quality control procedure used by these carriers for maintaining and improving the quality of telephone service." 2 U.S.Code Cong. and Admin.News, p. 2182 (1968). Existing law, when § 2511(2)(a) was enacted, included not only *Beckley* but several other cases noted *supra,*[8] which upheld the validity of investigations of subscriber fraud. The language of the statute, the Senate Report and the cases upon which the section drew make it clear that the proviso was not intended to be a general limitation on wire fraud investigations, but is a limitation on "service observing and random monitoring" —a broad type of surveillance not involved in this case.

■ Next appellants raise virtually the same argument considered in *United States v. Freeman, supra,* that 47 U.S.C. § 605, limiting the disclosure of intercepted messages, places limitations on disclosures under section 2511(2)(a), thus making these investigatory disclosures illegal. The language of the amendment to § 605 providing that, "*except* as authorized by chapter 119, title 18, United States Code [18 U.S.C. §§ 2510–2520]" no person may disclose certain wire communications, is a clear manifestation of Congress' intent that § 605 shall not limit § 2511 investigations. Lest there be any doubt, the Senate Report on the amendment states, "This section is not intended merely to be a reenactment of section 605. The new provision is intended as a substitute. The regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code." 2 U.S.Code Cong. and Admin.News, p. 2196 (1968). The conclusion of the court in *Freeman,* 373 F.Supp. at 52, that § 2511 is an exception to the prohibitions in § 605, is unassailable. It is clear that in enacting § 2511(2)(a) Congress intended to permit wire service carriers to conduct investigations designed to prevent subscriber fraud.

■ Finally, did the procedure followed comply with § 2511(2)(a) and constitute reasonable monitoring of appellants' telephone lines? The first phase of the investigation consisted of checking computer billing reports. The telephone company's authority to keep such records and utilize them in the ordinary course of business as well as in fraud investigations is well established and is not seriously challenged by appellants. See *United States v. Covello,* 410 F.2d 536, 542 (2 Cir. 1969). The second stage of the investigation occurred when agent Schmidt placed a peg-count meter on appellants' line to detect the presence of multi-frequency tones. Numerous cases have upheld the authority of both the telephone company and government agents to place such devices on phone lines since the right of privacy protected by the wire tap statutes goes to message content rather than the fact that a call was placed. See *United States v. Clegg,* 509 F.2d at 610, and the cases cited therein at note 6. The use of the meter was not improper.

■ The investigation's final phase consisted of placing the fraud documenta-

---

8. See cases cited in note 2.

tion device on the line to record the first 90 seconds of the fraudulent calls. Appellants strenuously object to the telephone company's installation of this unit and contend that its use was far beyond any investigatory technique authorized by § 2511(2)(a). As noted by the court in *Clegg*, 509 F.2d at 612, n. 11, however, "Recording of the salutations (of phone calls) is necessary to protect the property rights of a telephone company. Completion of the call must be shown both in a prosecution for wirefraud and to entitle the company to charge the caller for the use of its long distance service". We agree. The recording of the first part of the fraudulent calls was sufficiently limited to protect whatever legitimate rights of privacy the appellants had, and the company's utilization of the device for 11 days was not excessive to make the investigation unreasonable.[9] This case does not involve unreasonable monitoring, as found in *Bubis v. United States, supra,* where the phone company recorded every phone call made or received by the suspect for three months. Rather, only fraudulent calls were recorded, the recordings were limited to the initial portion of the calls, and the device was installed only long enough to allow the company to insure that it could sustain a successful prosecution. The investigation was reasonably justified and "to an extent reasonably necessary for the company's investigation" and was, therefore, permissible. *United States v. Bubis*, 384 F.2d at 648.

## VALIDITY OF SEARCH WARRANT

In the recent case of *United States v. Douglas*, 510 F.2d 266, 268 (9 Cir. 1975), this court held that an F.B.I. agent's affidavit stating the results of a telephone company's investigation of "blue box" usage and reciting the investigatory techniques used was sufficient to establish probable cause for a search of the suspect's premises by federal agents. *Douglas* is controlling here. The agent's affidavit gave the telephone company investigator's name, his training, and position with the company, and summarized the investigatory procedures. The affidavit was accompanied by an investigative summary listing the number of fraudulent calls detected by the investigation and indicating the location from which the phone company suspected the calls were coming. The affidavit and investigative summary were adequate to establish probable cause.

■ Appellants argue, however, that despite *Douglas*, the affidavit failed to meet the reliability tests established in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), because the affiant did not state his own personal knowledge of Schmidt's reliability. *Spinelli* and *Aguilar* were concerned with search warrants issued on the basis of tips from unnamed informants. The reliability of agent Schmidt, who was named in the affidavit and whose investigative results were included with the affidavit, was far more credible than the information considered in *Aguilar* and *Spinelli*.[10] Further, as the Court stated in *Aguilar*, 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 729:

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant . . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the [illegal items] were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant

**9.** The recordings introduced at the trial indicate that once the recorder is activated by a 2600 hertz tone, the first 20 seconds of the recording consist of multi-frequency tones being used to contact the phone being called and the ringing of that telephone before it is answered. Thus, only 70 seconds of actual conversation is recorded before the device shuts itself off automatically. The use of such a device seems less

intrusive than having a manually operated and monitored recorder on the line, if manual detection is possible.

**10.** The F.B.I. agent had known Schmidt for over 20 years, and had personal knowledge of Schmidt's electronic expertise and his long experience in "blue box" investigations.

. . . was 'credible' or his information 'reliable.' "

The affidavit was clearly sufficient under the *Spinelli-Aguilar* test to permit the magistrate to issue the warrant.

## LEGALITY OF INVESTIGATION UNDER STATE LAW

California Penal Code § 631 states in pertinent part:

"(a) . . . Any person who, . . . intentionally taps or makes any unauthorized connection . . . with any telegraph or telephone wire . . . or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . is punishable by a fine . . . or by imprisonment . . . or by both . . . .

"(b) Exceptions. This section shall not apply (1) to any public utility engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited herein are for the purpose of construction, maintenance, conduct or operation of the services and facilities of such public utility, or (2) to the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of such public utility, or (3) to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

"(c) Evidence. Except as proof in an action or prosecution for violation of this section, no evidence obtained in violation of this section shall be admissible in any judicial, administrative, legislative or other proceedings."

 Appellants contend that the telephone company's investigation does not fall within the exceptions of § 631(b) and was in violation of state law. This argument was answered by a recent decision of the California Court of Appeals holding that "blue box" investigations by telephone companies are allowable under California law. *People v. Mahoney*, 47 Cal.App.3d 699, 122 Cal.Rptr. 174 (1975). Concerning the validity of an investigation virtually identical to the one in this case, the court stated in *Mahoney*, 122 Cal.Rptr. at 185, n. 4, 122 Cal.Rptr. at 185:

"Section 631, subdivision (b), states an exception applicable to public utilities providing communications services and their agents where the acts otherwise prohibited 'are for the purpose of construction, maintenance, conduct or operation of the services and facilities of such public utility.' Though the language employed is different, it would appear that this section is consistent with the provisions of section 2511 of Title 18 of the United States Code. As pointed out in *Hanna, supra*, 404 F.2d 405, the conduct of the phone company's business requires it to detect and prevent toll fraud." [11]

We reject appellants' argument that the investigation was in violation of state law. [12]

## ADMISSION OF EVIDENCE BY STIPULATION

Appellant Goldstein contends that her Sixth Amendment right of confrontation was violated when her attorney stipulated to the admission of evidence without her

11. There is dictum in an earlier case, *Pacific Tel. & Tel. Co. v. Superior Ct.*, 2 Cal.3d 161, 84 Cal.Rptr. 718, 465 P.2d 854 (In banc 1973) which standing alone appears to be contra to *Mahoney*. The investigation in *Pacific Tel. & Tel. Co.*, however, was not limited to detecting wire fraud but consisted of monitoring and recording all of the suspect's calls in order to detect various alleged illegal activities. The explicit holding of *Mahoney* appears to be the better statement of California law. See also *People v. Garber*, 275 Cal.App.2d 119, 80 Cal. Rptr. 214 (1969), in which the court found

"blue box" investigations to be permissible under pre- § 631(b) law.

12. Having concluded that the investigation did not violate California law, we do not reach the Government's contention that federal law would allow the admission of the evidence regardless of any state law prohibition. We note, however, that the court in *Mahoney* found the effect of federal law to be an alternative ground for holding that § 631 did not prohibit "blue box" investigations.

stated waiver of such right on the record. Her argument is based on *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938), and other cases holding that where a fundamental constitutional right is waived, the record must show a voluntary intentional waiver. A similar contention was exhaustively analyzed by this court in *Wilson v. Gray*, 345 F.2d 282 (9 Cir. 1965), where the court noted at 345 F.2d 286:

> "It has been consistently held that the accused may waive his right to cross examination and confrontation and that the waiver of this right may be accomplished by the accused's counsel as a matter of trial tactics or strategy. E. g., *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912) . . . ."

After discussing the Supreme Court cases which established the guidelines for determining whether there has been an effective waiver of a federal constitutional right, the court concluded at 345 F.2d 290:

> "Variations in the factual context giving rise to the issue of waiver of any one right of the accused are infinite. Whether the waiver of a given right under the circumstances must be made by the accused personally or may be made by his counsel as a matter of trial strategy or tactics is necessarily an issue that must be resolved by the common law decision-making process, the process of inclusion and exclusion."

We find nothing in the more recent Supreme Court decisions cited by counsel on the issue of waiver which indicate that the admission of evidence by stipulation must be accompanied by a formal waiver from the defendant, and we decline to fashion such a rule. Our review of the trial record indicates that appellant's strategy at the time of the trial was to challenge the legality of the telephone company's investigation rather than the evidence supporting the charges. We see no deprivation of due process in counsel's decision, without objection from appellant who was present when the stipulation was made, which requires reversal.

## SPECTOGRAPHIC VOICE IDENTIFICATION

Appellants contend that the court erred in allowing voice identification of the recorded telephone conversation by an F.B.I. agent who worked on the case rather than requiring voice print identification as requested by appellants at the trial. We find no merit in this contention.

As this court has recently noted in *United States v. Turner, et al.*, 528 F.2d 143, 164 (9 Cir. 1975), voice identification is an issue of fact which may be established by both direct and circumstantial evidence. The *Turner* decision gave express approval to voice identification by federal agents who had familiarized themselves with the defendants' voices during their investigation. There is no requirement in this circuit that spectographic analysis be utilized, and in fact the federal courts remain divided over the admissibility of such evidence. See *United States v. Frank*, 511 F.2d 25, 33 (6 Cir. 1975). In the present case, several of the recordings admitted into evidence contained references to the appellants by name. The F.B.I. agent who identified appellants' voices took voice exemplars from the appellants and had conversations with them. An adequate foundation was established to show that the government witness could identify the appellants' voices on the recordings. See *Espinoza v. United States*, 317 F.2d 275, 276–277 (9 Cir. 1963). We find no error in the district court's denial of appellants' demand for spectographic analysis.

## SUFFICIENCY OF EVIDENCE

Finally, appellant Goldstein argues that the evidence was insufficient to sustain her conviction. "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances'". *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942). Moreover, "circumstantial evidence is not inherently less probative than direct evidence" and

under some conditions "may be even more reliable". *United States v. Nelson*, 419 F.2d 1237, 1239 (9 Cir. 1969). It is usually necessary to rely on circumstantial evidence where, as here, covert crimes are charged. As a reviewing court we must sustain the finding of the trial court if "there is substantial evidence, taking the view most favorable to the Government, to support it". *Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469, 86 L.Ed. at 704. Considering the evidence as a whole, in the light of the standards set forth in *Glasser* and *Nelson*, the evidence clearly permitted a rational conclusion that Goldstein was guilty beyond a reasonable doubt.

Goldstein was employed as Roberts' secretary, and one of her duties was to place long distance telephone calls. The Government offered proof that Goldstein's voice was present in some of the fraudulent telephone calls recorded by the fraud detection device.[13] Goldstein argues that there was no direct evidence to show that she placed any of the calls and that recordings in which her voice was identified indicated only that she came to the phone after the calls were placed by someone else. It was not necessary, however, for the Government to prove that Goldstein actually placed the calls. It was sufficient to show that she was acting with another in a common scheme to place phone calls in violation of the statute. *United States v. Conte*, 349 F.2d 304, 306 (6 Cir. 1965).

It is undisputed that the "blue box" was found on Goldstein's desk and that she was seen attempting to hide an accessory to that device when the F.B.I. searched the premises. While each of these facts alone may not have been sufficient to prove Goldstein guilty of committing wire fraud in violation of 18 U.S.C. § 1343 and of conspiring to violate the statute, the evidence taken as a whole would lead a trier of fact to conclude that Goldstein was guilty as charged.

The judgments are affirmed.

**13.** Goldstein contends that the voice on the recordings was not hers. After reviewing the tape recordings and voice exemplars introduced at the trial (Plaintiffs' Exhibits 14, 16B, 16C and 16D), we are persuaded, as was the trial judge, that Goldstein's voice was correctly identified by the Government.