UNITED STATES of America,
Plaintiff-Appellee,

v.

Bernard CORNFELD, dba Grayhall, Inc.,
Defendant-Appellant.

No. 76–3391.

United States Court of Appeals,
Ninth Circuit.

Oct. 27, 1977.

Richard H. Kirschner, Kirschner &
Greenberg, Cossack & Artz, Los Angeles,
Cal., for defendant-appellant.

Robert L. Brosio, U. S. Atty., Los Ange-
les, Cal., for plaintiff-appellee.

Before ELY and HUFSTEDLER, Circuit
Judges, and LINDBERG,* District Judge.

* The Honorable William J. Lindberg, Senior United States District Judge, Seattle, Wash-
ington, sitting by designation.

PER CURIAM:

Appellant Bernard Cornfeld was convicted by jury trial on three counts of fraud by wire, in violation of 18 U.S.C. § 1343, for the use of two multi-frequency signal generators, called "blue boxes", which enabled callers to reroute long distance telephone calls and avoid being billed for the services. We affirm.

I

The indictment chronologically broke down the scheme to defraud into two separate time periods. Between July 20 and October 18, 1974, Cornfeld utilized or caused to be utilized the "415" area code scheme, and between approximately October 29, 1974 and January 28, 1975, he utilized or caused to be utilized the "800" area code scheme. Count three pertained to a single telephone call on or about January 17, 1975, with respect to a call to Geneva, Switzerland.

In December, 1974, William Chaney, an experienced Pacific Telephone Company (Pacific) investigator, routinely reviewed an 800 INWATS print-out for the period between October 29 and November 7, 1974, and noted that twelve "800" number calls were made from telephone number 274–8698, registered to Grayhall, Inc., 1100 Carolyn Way, Beverly Hills, California (Grayhall). Seven of these calls were made to the Sheraton Hotel Reservation Service at 800–325–3535 and lasted a total of eighty-nine minutes, an average of 12.7 minutes. Chaney's suspicions became aroused because of the Sheraton reservation service number is one commonly employed by blue box users and the normal time period within which reservation services are executed is less than three minutes. A check of the application for telephone service showed that appellant Cornfeld was president of Grayhall.

Pursuant to Pacific's policy, Chaney requested from the accounting department of the company a "series 300" study on 274–8698. The series 300 study contained a print-out of every number that was dialed from 274–8698 to numbers outside the area code 213. Chaney found that twenty-seven calls were placed to various area code 800 numbers during the period between November 25 and December 21, 1974, with an average calling time of 12.7 minutes per call.

At the same time Chaney learned that the telephone number 274–8698 was one of three telephone numbers assigned in rotary to Grayhall; the other numbers were 274–8696 and 274–8697. Chaney additionally discovered that 274–4688 was assigned to Grayhall as a separate number. Following Pacific's standard procedure for documentation in potential "blue box" cases, Chaney attached a CMC 2600 device to 274–8698 on January 8, 1975. The CMC 2600 is a device which registers on a counter the number of times a 2600 cycle tone, a tone emitted by blue boxes, is sent across the line. On the same day, Chaney connected a tape recorder to the CMC 2600. The tape recorder was activated automatically when the CMC 2600 registered a burst of 2600 cycle activity and would automatically terminate the recording after two minutes. Deciding to use a more sophisticated device, he replaced the CMC 2600 with a Hekemian 51A. This device not only performed the same functions as the former, but also produced a tape print-out in black lettering of all outgoing calls from the telephone, and shifted to an upper key and printed in red ink the numbers called via the blue box. The Hekemian 51A was attached from January 8 until January 28, 1975, a period of twenty days; the tape recorder was attached for only 13 days.

On January 17, 1975, the CMC 2600 was attached to telephone number 274–4688; on January 21, the two-minute tape recording device was attached. While the CMC 2600 was removed on January 28, 1975, eleven days later, the tape recorder was removed after only one day.

In the opinion of Chaney, the total number of area code 415 calls listed that were completed via the blue box was 319; the total number of area code 800 calls was 55. On January 22, 1975, Chaney informed the F.B.I. of his investigation. On January 28,

F.B.I. Special Agent Willie White partici-pated in the execution of a search warrant at Grayhall. The agents recovered two blue boxes, a group of cards containing numbers frequently called via the blue box, and directions for using a blue box, all in a third floor, locked bedroom.

On the basis of the material produced by Pacific and the evidence obtained in the search of Grayhall, Cornfeld was charged with three counts of fraud by wire and causing an offense, under 18 U.S.C. §§ 1343 and 2. Cornfeld moved under Rule 41(f), Fed.R.Crim.Proc., to suppress all of the evi-dence resulting from the telephone compa-ny's investigation and from the F.B.I. search. Following a hearing, the motion to suppress was denied. The matter was tried to a jury on August 3, 1976, resulting in findings of guilty on all counts on August 10, 1976.

## II

The numerous issues raised on appeal may be summarized as follows:

(1) whether Pacific Telephone Company conducted its investigation in a constitu-tionally and statutorily proper manner un-der federal law;

(2) whether the Communications Act of 1934 and Title III of the Omnibus Crime Control Act authorized the monitoring of telephone calls in the manner done by Pa-cific Telephone in this case;

(3) whether the evidence should have been excluded because it was obtained in violation of state law;

(4) whether the prosecution's conduct during trial was improper and resulted in substantial prejudice;

(5) whether the prosecution's summation impermissibly commented on Cornfeld's failure to testify;

(6) whether the questioning of prosecu-tion and defense witnesses by the trial judge was improper; and

(7) whether the evidence adduced at trial was sufficient to prove guilt beyond a rea-sonable doubt.

## III

■ The appellant's primary argument, raised by the first three issues, asks this court to address again the propriety of the investigative conduct of a private telephone company, in light of the Communications Act of 1934, 47 U.S.C. § 605, and Title III of the Omnibus Crime Control Act, 18 U.S.C. § 2511(2)(a)(i).[1] Cornfeld alleges that the attachment of the CMC 2600 device, the monitoring of the telephone lines by the tape recorder, and the subsequent disclosure to the F.B.I. of the information secured through these devices were made in viola-tion of federal and state law.

The same issues were presented in *United States v. Goldstein,* 532 F.2d 1305 (9th Cir. 1976), *cert. denied,* 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1977); *see also United*

1. 47 U.S.C. § 605 prohibits unauthorized publi-cation or use of wire or radio communication:
   Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiv-ing, transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued

   by a court of competent jurisdiction, or (6) on demand of other lawful authority.
   18 U.S.C. § 2511(2)(a)(i) provides that:
   It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his ser-vice or to the protection of the rights or property of the carrier of such communica-tion: *Provided,* That said communication common carriers shall not utilize service ob-serving or random monitoring except for me-chanical or service quality control checks.

*States v. Auler,* 539 F.2d 642 (7th Cir. 1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). Appellant argues that Pacific's monitoring violated the exceptions previously carved out of § 605, in that it was not reasonable or necessary to tape record or attach additional monitoring devices to the telephones after Chaney first determined in his mind that a blue box was in fact being used. According to Chaney's testimony, this occurred after he had reviewed the 800 INWATS print-out and the series 300 study, and before any devices were actually attached to the telephones. In *Goldstein, supra,* we re-affirmed our earlier decision in *Bubis v. United States,* 384 F.2d 643 (9th Cir. 1967), that in the enactment of § 605, Congress did not intend to deprive communications systems of their fundamental right to take reasonable measures to protect themselves and their properties against the illegal acts of a trespasser. Under § 605, it became well established that a telephone company could monitor and disclose telecommunications on its line to the extent "reasonably necessary" to protect its property from fraud. *United States v. Goldstein, supra* at 1309, and n. 2. But the authority to intercept and disclose wire communications is not unlimited, we noted. The telephone company may only intercept a communication which is a "necessary incident to the rendition of . . . service or . . . [for] the protection of the [company's] rights or property . . .", 18 U.S.C. § 2511(2)(a)(i). While in *Bubis, supra* at 648, the court reversed a conviction where it was shown that the telephone company had resorted to "unreasonable practices", this court did note that "reasonable methods" included the use of a frequency recording device and limited use of a tape recorder to identify the offending parties. Subsequently, in *United States v. Goldstein, supra,* we extended this authority to include the authorized release to federal authorities such as the F.B.I., the information gathered.

The appellant has failed to demonstrate how the factual situation present in this case is distinguishable from that found in *Goldstein,* such that a different result is required. The question of the violation of state law was decided adversely to appellant in *Goldstein,* and requires no further elaboration.

### IV

■ Appellant next alleges that improper prosecutorial conduct was intended to mislead the jury and resulted in substantial injustice. In this regard, appellant cites various statements made by the prosecutor during his opening argument regarding the forthcoming testimony of several witnesses, various alleged admonitions by the court to the prosecutor concerning the type of questions he was asking, and an alleged innuendo that Cornfeld and a witness were "sleeping together". A review of the transcript fails to indicate that the prosecutor strayed beyond the permissible bounds, either in the opening or closing arguments. Furthermore, the appellant's failure to object at trial requires that he demonstrate plain error in order to win reversal of the conviction on appeal, *United States v. Memoli,* 449 F.2d 160 (9th Cir. 1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 979, 30 L.Ed.2d 801 (1972); Rule 52(b), Fed. R.Crim.Proc., and no such error has been shown. As to the "sleeping together" remark, when read in its full context, it is clear that the remark dealt only with the inquiry as to whether or not the witness and Cornfeld were together at all times and addressed the question of the credibility of the witness in testifying that Cornfeld had no opportunity to use a blue box. The question was an appropriate area of inquiry and only in the most convoluted of readings could it be construed to imply what appellant would have us believe it implied.

### V

■ The appellant next argues that the prosecutor commented on Cornfeld's failure to testify. During his closing argument, the prosecutor stated that "in a fraud-type case such as this, the individual, the defendant, who has perpetrated the fraud is the one who wants to keep it a

secret. . . . In this particular case you have a clever individual who used people to insulate himself from criminal responsibility . . . in a very clever way, by keeping quiet about the blue boxes." Later he stated to the jury that "it is totally illogical, totally illogical, that the defendant could present this story . . .." Read in their full context, the remarks do not indicate a reference to Cornfeld's failure to testify, but rather refer to the assertion that one who engages in criminal activity is not going to make it public knowledge. It is entirely appropriate for the prosecutor to argue to the jury and attempt to explain away the reason for Cornfeld's secrecy in the operation of the blue boxes. The comments were not of such a character that the jury would naturally and necessarily take them to be comments on the failure of the accused to testify, *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Furthermore, no objection was made at the time of the comments and they cannot be construed as plain error, *United States v. Parker*, 549 F.2d 1217 (9th Cir. 1977), *cert. denied*, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977); Rule 52(b), Fed.R.Crim.Proc.

## VI

█ Appellant next argues that the trial judge improperly questioned prosecution and defense witnesses to the extent that actual prejudice inhered to Cornfeld. The allegation is without merit. The trial judge may question witnesses to clear up ambiguities and clarify the issues for the jury, so long as he maintains an appearance of impartiality, Rule 614, Fed.R.Evid.

## VII

█ Finally, the appellant argues that the evidence adduced at trial was insufficient to prove guilt beyond a reasonable doubt. The proper standard for determining the sufficiency of the evidence on appeal is "whether the trier of fact could reasonably arrive at its conclusion," *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v.*

*Rojas*, 458 F.2d 1355, 1356 (9th Cir. 1972). The record indicates that Cornfeld was an incorporator of Grayhall; was listed as president on all telephone bills; used the residence as his principal residence from May, 1974 through January, 1975; was in control of the secretaries; and instructed his secretaries to place overseas calls for himself and his guests. Borland's testimony about her conversation with Cornfeld in mid-October, 1974 indicated that she discussed blue boxes with him and was told to prepare an "800" number list; Cornfeld kept after her to prepare the list. Carson's testimony indicated that there was a blue box at the residence at least as early as late 1971 and that she gave Cornfeld a clear warning about the danger of using the devices.

Read as a whole, there is more than ample evidence from which the trier of fact could determine that Cornfeld used or caused to be used blue boxes in the placing of long distance telephone calls.

Affirmed.