**James L. HODGE, Plaintiff-Appellant,**

v.

**The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Foreign Corporation, Defendant-Appellee.**

No. 74–2162.

United States Court of Appeals,
Ninth Circuit.

June 8, 1977.

I. Harrison Levy, Phoenix, Ariz., argued for plaintiff-appellant.

Roger C. Mitten, Fennemore, Craig, von Ammon & Udall, Phoenix, Ariz., argued for defendant-appellee.

Before MERRILL and HUFSTEDLER, Circuit Judges, and RENFREW,* District Judge.

RENFREW, District Judge:

Appellant James L. Hodge appeals from an order granting summary judgment in favor of appellee Mountain States Telephone and Telegraph Company. In his complaint appellant asserted a number of federal and state claims, all of which relate

* The Honorable Charles B. Renfrew, United States District Judge, Northern District of California, sitting by designation.

to appellee's installation of a pen register [1] on his telephone. Appellant's federal claims were that the actions taken by employees of appellee in installing the pen register and divulging some of the information recorded by the device violated his rights under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*; Section 605 of the Communications Act of 1934, 47 U.S.C. § 605; and the Fourth Amendment to the Constitution of the United States. Appellant's state claims were asserted under the doctrine of pendent jurisdiction. The district court granted summary judgment against appellant as to all claims.[2] For reasons somewhat different from those relied upon by the district court, we affirm as to the federal claims; the state claims are remanded with instructions to dismiss for lack of federal jurisdiction.

After receiving a number of complaints of obscene and annoying telephone calls, appellee began an investigation of those calls in the first part of 1970. Obtaining the cooperation of a woman subscriber who had been the target of a number of obscene calls, security agents employed by appellee traced one such call through the telephone company circuits to appellant's telephone. Soon thereafter the security agents attached a pen register to appellant's telephone. No attempt was made to obtain a search warrant. The device remained in place recording the numbers dialed from that telephone for a period of approximately seventeen days. As part of the investigation, the security agents telephoned the subscribers whose numbers were recorded by the pen register to ask if they were having any trouble with their telephone service. If asked why they were calling, the security agents would explain that the appellee had received complaints that obscene telephone calls were being made and that there was an indication that the subscriber's number might have been called.

Appellant was tried and convicted by a jury on three counts of illegal use of the

1. A pen register was described in *United States v. Caplan*, 255 F.Supp. 805, 807 (E.D.Mich. 1966) as follows:

"The pen register is a device attached to a given telephone line usually at a central telephone office. A pulsation of the dial on the line to which the pen register is attached records on a paper tape dashes equal in number to the number dialed. The paper tape then becomes a permanent and complete record of outgoing numbers called on the particular line. With reference to incoming calls, the pen register records only a dash for each ring of the telephone but does not identify the number from which the incoming call originated. The pen register cuts off after the number is dialed on outgoing calls and after the ringing is concluded on incoming calls without determining whether the call is completed or the receiver is answered. There is neither recording nor monitoring of the conversation."

*See also United States v. Giordano*, 416 U.S. 505, 549 n. 1, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part).

Pen registers have a variety of uses. When used by telephone companies, they need not be associated with any kind of investigation of wrongdoing. For example, they are used to check for defective dials and for overbilling. The devices are also used in various intra-company investigations. For example, they are used to determine if a home telephone is being used to conduct a business and, as here, to investigate persons suspected of making annoying or obscene telephone calls. In addition, of course, pen registers may be useful in criminal investigations by law enforcement officials of activities such as illicit gambling where telephones are frequently used. Note, "The Legal Constraints Upon the Use of the Pen Register as a Law Enforcement Tool," 60 Cornell L.Rev. 1028, 1029 (1975).

2. The treatment of the federal claims in the district court's Memorandum and Order was quite terse and is set out in full below:

"The only applicable part of section 605 is the first sentence thereof. Because the security personnel are not among the class of persons described it follows there was no violation. See *Bubis v. United States*, 384 F.2d 643, 646 (9th Cir. 1967); *accord, United States v. Baxter, et al.*, [492 F.2d 150 (9th Cir. 1973)]. Furthermore, the term 'persons' as used therein does not include a law enforcement officer acting in the normal course of his duties. *United States v. Hall, et al.*, 488 F.2d 193 (9th Cir. 1973).

"With regard to the alleged violation of section 2510 *et seq.*, this Act was not intended to prevent the tracing of calls or the use, as here, of the pen register. *United States v. Lanza*, 341 F.Supp. 405 (M.D.Fla.1972), and cases cited therein." (Memorandum and Order, p. 2, March 7, 1974 (footnote omitted)).

telephone and one count of using the telephone to extort money. During the trial, security agents who had installed the pen register and a central office foreman who had supervised the security agents gave testimony based at least in part on the information recorded by the device. In a complicated series of post-trial rulings in the Arizona state courts, the jury verdict was set aside. No subsequent criminal proceedings have been brought. Our only concern is with the civil action brought by appellant.

## I

Appellant asserted a claim under 42 U.S.C. § 1983 for the appellee's alleged violation of appellant's Fourth Amendment rights in installing the pen register. This claim was properly rejected by the district court.

Assuming *arguendo* that the requisite state action could be found,[3] it is clear that no substantive Fourth Amendment right of the appellant has been violated by the appellee. This Court has held that "the expectation of privacy protected by the Fourth Amendment attaches to the content of the telephone conversation and not to the fact that a conversation took place." *United States v. Baxter*, 492 F.2d 150, 167 (9 Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974), citing *United States v. Fithian*, 452 F.2d 505, 506 (9 Cir.

1971). Because a pen register record does not indicate whether the calls placed on the monitored telephone were completed, it does not even establish that "a conversation took place." Nevertheless, we recognize that pen registers are not squarely within the existing precedent. In *Baxter* and *Fithian* we rejected a claim that the Fourth Amendment applies to telephone company billing records. The public awareness that such records are routinely maintained was held to negate any constitutionally sufficient expectation of privacy[4] regarding the records.[5] Although a pen register record differs from telephone company billing records, we have no difficulty in now holding that the information recorded is not protected by the Fourth Amendment.

A pen register record for a particular telephone contains information different from the telephone company billing records for that telephone. Telephone company billing records show only completed calls, not, as with a pen register, the numbers dialed. Furthermore, a pen register record shows the dialing of telephone numbers which, even if completed, would not be shown by billing records, because the numbers are within a local dialing area. It could be argued that since no records of such calls are normally maintained, an expectation of privacy exists. This admitted difference is not, in our view, of constitu-

3. Although we need not decide the point, we doubt that the requisite state action exists here. There was clearly cooperation between appellee's security agents and the local police, but cooperation alone is not sufficient. In *United States v. Goldstein*, 532 F.2d 1305, 1311 (9 Cir. 1976), also involving a telephone company investigation, this Court approved the following language from the decision of the Court of Appeals for the Fifth Circuit in *United States v. Clegg*, 509 F.2d 605, 609 (5 Cir. 1975): "It is only when the government has preknowledge of and yet acquiesces in a private party's conducting a search seizure which the government itself * * * could not have undertaken * * * [that the requisite state involvement exists]."

4. The expectation of privacy analysis of the Fourth Amendment originated in the Supreme Court's decision in *Katz v. United States*, 389 U.S. 347, 351–352, 88 S.Ct. 507, 19 L.Ed.2d 576

(1967). It was further explained in the plurality opinion of four Justices in *United States v. White*, 401 U.S. 745, 751–752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971):

"Our problem is not what the privacy expectations of particular defendants in particular situations may be * * *. * * * Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally 'justifiable'— what expectations the Fourth Amendment will protect in the absence of a warrant."

5. In *United States v. Fithian*, 452 F.2d 505, 506 (9 Cir. 1971), this rationale was made explicit: "No one justifiably could expect that the fact that a particular call was placed will remain his private affair when business records necessarily must contain this information." (Footnote omitted.)

tional dimension[6] and is more than offset by the fact that pen register records are even farther removed than billing records from the content of the communications. Viewed in the round, the information recorded by pen registers is not entitled to Fourth Amendment protection.[7] This conclusion has also been reached by the Court of Appeals for the Fifth Circuit in *United States v. Clegg*, 509 F.2d 605, 610 (5 Cir. 1975).[8]

## II

■ Appellant also asserted a claim under 18 U.S.C. § 2520 for the use of the pen register in alleged violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III"). We hold that the district court was correct in holding that the use of the pen register did not constitute a violation of Title III and that appellant therefore was not entitled to recover under § 2520.

No extended statutory exegesis is necessary to dispose of appellant's argument. Title III prohibits the interception of wire or oral communications except by law enforcement officials under carefully defined circumstances. The disclosure and use of intercepted communications is prohibited unless the interception was authorized under the statute. For our present purposes, the statutory linchpin is the concept of interception, which is defined by § 2510(4)[9] as "the *aural* acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." (Emphasis added.) Because a pen register is incapable of making an aural acquisition of any communication, the use of the device does not fall within the statute. This conclusion is further buttressed by the legislative history of Title III. The Senate Report includes the following statement regarding the question now before us:

"Paragraph (4) defines 'intercept' to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation. See *Lee v. United States*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *Corngold v. United States*, 367 F.2d [1] (9th 1966). An examination of telephone company records by law enforcement agents in the regular course of their duties would be lawful because it would not be an 'interception.' (*United States v. Russo*, 250 F.Supp. 55 (E.D.Pa.1966) ). The proposed legislation is not designed to prevent the tracing of phone calls. *The use of a 'pen register,' for example, would be permissible.* But see *United States v. Dote*, 371 F.2d 176

---

**6.** The existence of a constitutional right should not depend upon the boundaries established by the telephone company for its local calling areas.

**7.** The possibility that the Fourth Amendment applies to pen registers has not been foreclosed in all circuits. *See, e. g., United States v. John*, 508 F.2d 1134, 1141 (8 Cir.), *cert. denied*, 421 U.S. 962, 95 S.Ct. 1948, 44 L.Ed.2d 448 (1975). *See also United States v. Giordano*, 416 U.S. 505, 554 n. 4, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part). In *United States v. Falcone*, 505 F.2d 478, 482 and n. 21 (3 Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975), the Court of Appeals for the Third Circuit apparently concluded that the Fourth Amendment requires some authorization for the use of pen registers, although the court did not discuss the authorization necessary when a pen register is used apart from an accompanying wiretap.

**8.** In *Clegg*, the telephone company security agent had monitored the defendant's telephone with a TTS 176 device, a device which "is capable of detecting blue box calls" and which also "produces a paper tape record of the time and date of all outgoing telephone calls, local and long distance, complete and incomplete." 509 F.2d at 608. A TTS 176 device apparently differs from a pen register only in its ability to detect the special frequencies emitted by blue boxes, devices which allow their users to circumvent the normal billing mechanisms of the telephone system. In *Clegg* the court treated TTS 176 devices and pen registers as equivalent for purposes of Fourth Amendment analysis, holding that neither raised any Fourth Amendment issue. 509 F.2d at 610.

**9.** The statutory definition is of the word "intercept".

(7th 1966). The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication." S.Rep. No. 1097, 90th Cong., 2d Sess. 90, U.S.Code Cong. & Admin.News 1968, pp. 2112, 2178 (1968) (emphasis added).

Other courts that have had occasion to consider the issue have also concluded that pen registers are not controlled by Title III. *See, e. g., United States v. Falcone,* 505 F.2d 478, 482 (3 Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *United States v. Brick,* 502 F.2d 219, 223 (8 Cir. 1974). *See also, United States v. Giordano,* 416 U.S. 505, 553, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part).

There is no statutory basis for appellant's argument that an aural acquisition of the contents of a telephone call, triggering the provisions of Title III, occurs when the persons whose telephone numbers were recorded are questioned about the call in a subsequent investigation. Appellant has not suggested that the subsequent investigations involved any independent violation of law. Certainly, appellant as one party to a telephone conversation has no right under Title III to prevent another party to that conversation from discussing it in response to legitimate questions. The pen register is a device used typically in the early stages of an investigation to generate leads for further inquiry. In excluding the use of pen registers from the scope of Title III, Congress certainly did not intend to outlaw the subsequent use of the information obtained from the device. Arguing, in effect, that two rights make a wrong, appellant would have us adopt the doctrine that the fruit of the non-poisonous tree cannot be used by investigatory authorities. This we decline to do.

### III

■ We also hold that the district court did not err in concluding that appellant could not base a claim on 47 U.S.C. § 605. Only the first sentence of § 605 applies to wire communications. It provides, in pertinent part:

"Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney * * *." [10]

Prior to 1968, § 605 also prohibited the *interception* and divulgence by any person of wire communications.[11] The use of a pen register was such an "interception" within the meaning of clause 2 of the pre-1968 § 605. *United States v. Dote,* 371 F.2d 176, 180 (7 Cir. 1966); *United States v. Caplan,* 255 F.Supp. 805, 808 (E.D.Mich.1966). *See Application of United States in Matter of an Order Authorizing Use of a Pen Register,* 538 F.2d 956, 958–959 (2 Cir. 1976), *cert. granted,* 429 U.S. 1072, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977).

In 1968, however, Congress amended § 605 when it enacted the electronic surveillance provisions of the Omnibus Crime Control Act. Pub.L. No. 90–351, § 803, 82 Stat. 223 (1968). In addition to making certain changes in punctuation, Congress eliminated any reference to wire communications

---

**10.** The second sentence concerns the interception only of radio communications and does not apply to telephone communications. *United States v. Clegg,* 509 F.2d 605, 611 (5 Cir. 1975).

**11.** Prior to its amendment in 1968, § 605 provided, in pertinent part:

"No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception * * *; *and no person not being authorized by the sender shall intercept any communication* and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; * * *." 47 U.S.C. § 605 (1964) (emphasis added).

from the part of the section prohibiting interceptions. Congress made this change because it intended "[t]he regulation of the interception of wire or oral communications * * * to be governed by proposed new chapter 119 of title 18, United States Code." S.Rep. No. 1097, *supra,* at 107, U.S.Code Cong. & Admin.News 1968, p. 2196.

The Courts of Appeal for the Second, Third, Seventh, and Eighth Circuits have held that the 1968 amendment to § 605 ended the applicability of that section to the use of pen registers.[12] Their conclusion is supported by the legislative history of § 605. The first clause of the pre-1968 § 605 never regulated the use of pen registers, and there is no indication that Congress intended to begin such regulation when it converted that clause into the first sentence of the present § 605.

As discussed, *supra,* the use of pen registers constituted an interception within the meaning of the second clause of the pre-1968 § 605. The first clause of that section did not apply to individuals who *intercepted* wire communications, but rather to persons "receiving or assisting in receiving, or transmitting, or assisting in transmitting" communications in the normal course of their business. The clause did not even mention interception.[13] As the court noted in *United States v. Russo,* 250 F.Supp. 55, 58–59 (E.D.Pa.1966), the first clause of § 605 was not intended to prohibit the interception of wire communications, it was

> "designed to apply to persons such as telegram or radiogram operators, who must either learn the content of the message or handle a written record of communications in the course of their employment. Clause 1 recognizes that the integrity of the communication system demands that the public be assured that employees who thus come to know the content of messages will in no way breach the trust which such knowledge imposes on them."[14]

**12.** *Application of United States in Matter of an Order Authorizing Use of a Pen Register,* 538 F.2d 956, 958 (2 Cir. 1976), cert. granted, 429 U.S. 1072, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977). ("It is also clear that pen register orders are not now covered by Section 605 of the Federal Communications Act of 1934."); *United States v. Falcone,* 505 F.2d 478, 482 (3 Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975) ("[Section] 605 does not now control the use of pen registers * * *."); *United States v. Brick,* 502 F.2d 219, 223 (8 Cir. 1974) ("Nor is such use controlled by 47 U.S.C. § 605, as amended."); *Korman v. United States,* 486 F.2d 926, 931–932 (7 Cir. 1973) ("the clear intent of Congress would seem to be that the interception of wire communications would be governed solely by [18 U.S.C. § 2510 et seq.].").

These cases do not hold merely that the *use* of pen registers—as opposed to the disclosure of information so obtained—is no longer prohibited by § 605, as Judge Merrill suggests in his dissent. Section 605 never prohibited the mere interception of communications; clause 2 of the pre-1968 § 605 outlawed the interception *and* divulgence of communications.

**13.** Judge Merrill's conclusion that clause 1 of the pre-1968 § 605 prohibited divulgence by communications employees of both information gained in the normal course of their business and information gained by interception rests upon an extremely strained construction of the statute. Clause 1 provided that telephone company employees who assisted in the transmission or reception of communications could divulge the contents "thereof" only under certain enumerated circumstances, *e. g.,* to an addressee's agent, to an employee authorized to forward the communication, or in response to a subpoena, 42 U.S.C. § 605 (1964). Clause 2 provided that "no person" could *intercept* and divulge communications unless authorized by the sender or recipient.

Judge Merrill's construction of the pre-1968 § 605 is internally inconsistent. He suggests that clause 1 provided that certain communications employees could legally divulge both intercepted and non-intercepted communications under certain enumerated circumstances. Yet it is undisputed that clause 2 provided that *no person*—not even communications employees—could legally intercept and divulge communications without authorization. Thus under Judge Merrill's reasoning, clause 1 permitted what clause 2 clearly prohibited. Congress cannot be presumed to have enacted such an internally contradictory statute.

**14.** The court in *Russo* went on to conclude that because telephone employees can only learn of the existence or contents of a telephone call by interception, the first clause of § 605 did not apply to them at all. 250 F.Supp. at 59. That assumption is of course, unwarranted. In the course of their daily duties, telephone operators, servicemen, and other employees routinely learn of the existence and/or contents of telephone calls.

Interception of wire communications was prohibited by the second clause of the pre-1968 § 605. That clause provided that "*no person* not being authorized by the sender shall intercept any communication \* \* *."* (Emphasis added.) With respect to the divulgence of intercepted wire communications, it is clear that any prohibition of the first clause would have been completely subsumed by the broader prohibition of the second clause. Given the broad scope of the second clause, the first clause has independent meaning only if it is read to prohibit the divulgence of information acquired by means other than interception. To construe the first clause as prohibiting an "interception" would be incorrect for two reasons. First, there is a total absence of any language reflecting such an intention, and second, such an interpretation would have made the section redundant, because the second clause covered interceptions by all persons not authorized by the sender.[15]

There is no reason to believe that Congress intended to expand the scope of the first clause of the pre-1968 § 605 to include interceptions by adopting it as the first sentence of the post-1968 § 605. *See United States v. Baxter, supra,* 492 F.2d at 166 n. 15. In fact, Congress did not intend the new § 605 to deal with electronic surveillance at all: "Congress intended to shift all control of electronic surveillance operations to 18 U.S.C. §§ 2510–2520." *United States v. Falcone, supra,* 505 F.2d at 482.[16]

---

**15.** The only court to hold that use of a pen register violated the first clause of the pre-1968 § 605 did not consider the internal inconsistency of applying that clause to interceptions. *See United States v. Caplan,* 255 F.Supp. 805, 808 (E.D.Mich.1966). Despite Judge Hufstedler's implication to the contrary, no other federal court has ever held that the use of pen registers violates the first clause of the pre-1968 § 605 or the first sentence of the present statute.

**16.** I disagree with Judge Hufstedler's conclusion that the use of pen registers to apprehend those who make obscene telephone calls is part of a telephone company's inherent right "to protect the integrity of [its] communications systems \* \* *."* *Bubis v. United States,* 384 F.2d 643, 646 (9 Cir. 1967). In fact, this protection of integrity exception has always been limited to the telephone company's right to protect its property against users who attempt to circumvent billing procedures. *See, e. g., United States v. Goldstein,* 532 F.2d 1305, 1311 (9 Cir. 1976); *United States v. Freeman,* 524 F.2d 337, 340 (7 Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976); *United States v. Glanzer,* 521 F.2d 11, 12 (9 Cir. 1975); *United States v. Clegg,* 509 F.2d 605, 613 (5 Cir. 1975); *Brandon v. United States,* 382 F.2d 607, 610–611 (10 Cir. 1967). When this Court speaks in *Bubis* of protecting the integrity of communications systems, it means only that companies should be allowed "to take reasonable measures to protect themselves and their properties against the improper and illegal use of their facilities." 384 F.2d at 648. A telephone company may intercept a subscriber's calls only to the extent "necessary to protect the telephone company's property." 384 F.2d at 648 n. 5. A subscriber who seeks to circumvent telephone company billing procedures is "deemed to have consented to the company's monitoring of his calls to an extent reasonably necessary for the company's investigation." 384 F.2d at 648 (citation omitted).

Indeed, the best indication that Judge Hufstedler misreads *Bubis* is the holding of that case. This Court found that the telephone company did violate § 605 by exceeding the intrusion necessary to establish Bubis's circumvention of billing procedures. The telephone company may not gather evidence to be used against a subscriber in a prosecution for a different crime:

"It is equally difficult to find any implied consent by appellant to disclosure for the purpose of convicting him of using interstate telephone facilities for gambling. Disclosure for this purpose contributed nothing either to the collection of long distance tolls that appellant may have owed the company, or to preventing him or others from thereafter using long distance telephone facilities without paying." 384 F.2d at 648 n. 5.

This Court concluded that "[t]o sanction such practices on the part of the telephone company would tend to emasculate the protection of privacy Section 605 was intended to protect." 384 F.2d at 648.

Prosecution of obscene callers is no more likely to lead to the collection of long distance tolls than is the prosecution of interstate gamblers. The intent of this Court in *Bubis* was to limit strictly the circumstances under which a telephone company would monitor the calls of a customer. The holding in *Bubis* should not be relied upon to frustrate its very purpose.

The protection of integrity exception has never been used to allow telephone companies to investigate crimes committed against their subscribers over the telephone. As Judge Merrill correctly points out in his dissent, such an interpretation would open the door to tele-

Congress intended the amended § 605 to be a "substitute" for the pre-1968 § 605, not merely a "reenactment." S.Rep. No. 1097, *supra,* at 107. Congress enacted the new § 605 at the same time that it specifically considered and rejected regulating the use of pen registers under the Omnibus Crime Control Act. *See* Part II, *supra.* Under such circumstances, and in the absence of specific evidence of legislative intent, it would be anomalous to conclude that Congress decided to begin regulating the use of pen registers under § 605 by using language identical to clause 1 of the former § 605.

### IV

■ As stated above, we have concluded that appellant stated no federal constitutional or statutory claim. The district court also granted summary judgment against appellant on his state law claims. When a district court dismisses all federal claims prior to trial, it should not retain jurisdiction over pendent state claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Walling v. Beverly Enterprises,* 476 F.2d 393, 398 (9 Cir. 1973); *Wham-O-Mfg. Co. v. Paradise Manufacturing Co.,* 327 F.2d 748, 752–753 (9 Cir. 1964). In light of our disposition of the federal claims, we feel that it is appropriate to remand the state law claims to the district court with instructions to dismiss for want of federal jurisdiction.

Judgment affirmed in part and remanded for action consistent with this opinion.

HUFSTEDLER, Circuit Judge, specially concurring:

While I join in the result reached by Judge Renfrew, I cannot concur in his reasoning in concluding that Section 605, 47 U.S.C. § 605 (1976), does not prohibit the use of pen registers and that the Fourth Amendment does not restrict the use of a pen register.

### I

The problem presented by this appeal is one of interpretation: Did Congress intend to permit or prohibit pen registers under Section 605? This process of interpretation requires us to explore both legislative history and the judicial reception to pen registers under Section 605. While Judge Renfrew's analysis may offer a reasonable interpretation of Section 605's applicability to pen registers, it does not accurately represent the judicial response to pen registers under Section 605. In its failure to do so, Judge Renfrew's analysis skips over a crucial analytical stepping stone in arriving at a fair interpretation of Congress' intent with respect to pen registers under Section 605.

Pen registers have had a diverse history under Section 605. Prior to its amendment in 1968, Section 605 contained two clauses applicable to pen registers. Clause 1 pro-

phone company investigation of an extremely wide variety of offenses. Nor is there any reason to believe that the Fourth Amendment or § 1983 would be any more applicable to a telephone company's investigation of other crimes than it is to the investigation of obscene calls in this case.

The most disturbing aspect of Judge Hufstedler's dictum (she discusses the protection of integrity exception to § 605 after already having concluded that the statute does not apply to pen registers) is that her reasoning can be relied upon to broaden substantially the circumstances under which a telephone company may *wiretap* its customers' lines. When Congress enacted the Omnibus Crime Control Act of 1968, it preserved the right of telephone companies to intercept and disclose any communication when doing so "is a necessary incident * * * to the protection of the rights or

property of the carrier of such communication." 18 U.S.C. § 2511(2)(a)(i).

Citing *United States v. Beckley,* 259 F.Supp. 567 (N.D.Ga.1965), Congress enacted § 2511(2)(a)(i) "to reflect existing law" which allowed telephone companies to intercept communications in order to protect the integrity of their property. S.Rep. No. 1097, 90th Cong., 2d Sess. 93 (1968), U.S.Code Cong. & Admin.News 1968, p. 2112. This Court's decision in *United States v. Goldstein, supra,* 532 F.2d at 1309, upon which Judge Hufstedler relies, also cites *Beckley,* adopting its reasoning. Thus, if Judge Hufstedler is correct that the protection of integrity exception also includes the investigation of crimes committed over the telephone, then § 2511(2)(a)(i) would allow telephone companies to wiretap under the same circumstances. This is a dangerous and unnecessary precedent with which I cannot agree.

hibited, with certain exceptions inapplicable here, a telephone company employee who assisted in the transmission of a wire or radio communication from divulging the "existence, contents, substance, purport, effect, or meaning" of that communication. Clause 2 proscribed any person from intercepting and divulging the "existence . . or meaning" of a wire or radio communication except as authorized by the sender.[1]

Judge Renfrew states that because pen registers involve interceptions, only clause 2 of pre-1968 Section 605 applied to pen registers. Thus, after the 1968 Amendments removed clause 2's applicability to wire communications, Section 605 no longer regulated the use of pen registers. By characterizing pen registers as interceptions, Judge Renfrew forecloses any consideration of whether clause 1 prohibits pen registers. Presumably, Judge Renfrew finds this question academic because he concludes that "[t]he first clause of the pre-1968 § 605 never regulated the use of pen registers[.]" But, contrary to Judge Renfrew's assertions, not all courts characterized pen registers as interceptions and several courts used clause 1 to consider the validity of pen registers both prior to and after the 1968 Amendments to Section 605.

Before Section 605 was amended, courts employed both clauses 1 and 2 to strike down pen registers. In *United States v. Caplan* (E.D.Mich.1966) 255 F.Supp. 805, the court held that clause 1 was violated when the telephone company installed a pen register after the I.R.S. had sought its aid in investigating a suspected gambling operation. Although a pen register tape merely records those numbers dialed from a particular telephone and does not indicate whether the calls were completed, the *Caplan* court found that the tape was a communication under Section 605 because the number of telephone rings could have been a "pre-arranged" signal for the receiving party. To divulge the contents of the tape would be to disclose the existence of a communication and thereby to transgress clause 1 of Section 605. ("The . . . pen register recordation may reveal the 'existence' of a communication even though the pen register does not indicate whether or not the call was completed." *Id.* at 808.)

As merely an alternative basis for its holding, the district court in the *Caplan* case concluded that a pen register constituted an interception prohibited by clause 2 of Section 605. (*See also United States v. Dote* (7th Cir. 1966) 371 F.2d 176; *United States v. Guglielmo* (N.D.Ill.1965) 245 F.Supp. 534, aff'd in *Dote, supra. But cf. United States v. Gallo* (2d Cir. 1941) 123 F.2d 229, 231 (Where the court upheld the disclosure of the defendant's telephone records in a prosecution for tax fraud because telephone records did not involve an interception under clause 2: " . . . When a person takes up a telephone he knows that the company will make, or may make, some kind of a record of the event, and he must be deemed to consent to whatever record the business convenience of the company requires.").)

Section 605 received a legislative face-lift in Title III of the Omnibus Crime Control Act of 1968, Pub.L. No. 90–351, § 803, 82 Stat. 223 (1968).[2] Clause 2 was amended to

---

1. Section 605, prior to its amendment, stated in part:

"No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena [*sic*] issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person[.]" (47 U.S.C. § 605 (1962).)

2. Section 605, as amended, provides, in part:

"Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiv-

prohibit only the interception of radio communications. The courts that had treated pen registers as prohibited interceptions under clause 2 before 1968, now concluded that Section 605 no longer proscribed interceptions of wire communications by pen registers. (*See United States v. Brick* (8th Cir. 1974) 502 F.2d 219, 223; *United States v. Falcone* (3d Cir. 1974) 505 F.2d 478, 482; *Korman v. United States* (7th Cir. 1973) 486 F.2d 926, 932; *Application of the United States in the Matter of an Order Authorizing the Use of a Pen Register or Similar Mechanical Device* (2d Cir. 1976) 538 F.2d 956, 958–59, *cert. granted*, 429 U.S. 1072, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977) ("It is also clear that pen register orders are not now covered by Section 605 . . . . Prior to the enactment of Title III, there was authority for the broad applicability of Section 605 to the interception and disclosure of 'any communication,' including pen registers. . . . The amendment of Section 605 . . . withdrew the interception of wire . . . communications from the ambit of that Section, making Title III the sole governing provision.").) This reasoning was bolstered by the Senate Report accompanying Title III which commented that interceptions of wire communications were now covered by the Omnibus Crime Control Act (*i. e.*, 18 U.S.C. §§ 2510–2520 (1976)). (". . . The regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code." S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), as reprinted in [1968] U.S.Code Cong. & Admin.News pp. 2112, 2196 ["Senate Report"].)

On the other hand, Congress made only cosmetic changes in amending clause 1.

Judge Renfrew's analysis would stop here. Because Congress did not intend to expand clause 1 to regulate interceptions when it amended Section 605, Judge Renfrew concludes that Section 605 has no continued applicability to pen registers. This rationale ignores those cases that do not characterize pen registers as interceptions, and thus does not take into account cases, including the only one from this Circuit, that have looked to clause 1, as amended, to determine the validity of pen registers.

Because neither the Omnibus Crime Control Act nor clause 2 of Section 605 was applicable to pen registers after 1968, courts were forced to focus on clause 1 to consider the legality of pen registers. Although one court *squarely held*, in a telephone harassing prosecution, that the use of a pen register violated clause 1 (*see Commonwealth v. Coviello* (1973) 362 Mass. 722, 291 N.E.2d 416), the courts generally found that the particular uses of a pen register before them came within one of the exceptions to clause 1 enumerated in that clause. In those cases it was unnecessary to decide whether clause 1, as amended, prohibited pen registers. (*See United States v. King* (S.D.Cal.1971) 335 F.Supp. 523, 549, *aff'd in part and rev'd in part on other grounds* (9th Cir. 1973), 478 F.2d 494 (After noting that the *Caplan* court found that pen registers violated clause 1 and that clause 2 no longer applies to pen registers after the 1968 Amendments, the court observed, "[t]his would serve to remove pen register coverage from the second clause and include it, if at all, within the first clause. This Court believes that divulgence 'on demand of other lawful authority' must include disclosure pursuant to a search warrant issued under Rule 41 of the Federal Rules of Criminal

ing, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena [*sic*] issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

Procedure."); *United States v. Lanza* (M.D. Fla.1972) 341 F.Supp. 405, 422 (Where the court found it unnecessary to decide whether clause 1 of Section 605, as amended, prohibits pen registers because it held that when a pen register was used in conjunction with a court-ordered wiretap, the court-ordered wiretap was sufficient to permit the use of the pen register. It did note that *Caplan* "may still be efficacious."); *United States v. Finn* (7th Cir. 1974) 502 F.2d 938, 942–43 (After recognizing that clause 2 no longer applies to pen registers, the court considered the defendants' claims under clause 1. "We come then to the heart of the problem. The first sentence of Section 605 appears on its face to forbid divulgence of any communication to any of six groups of persons. . . . Facially, it would appear that Congress has absolutely forbidden the divulgence of pen register records, *e. g.,* in response to a subpoena . . . or on demand of other lawful authority . . . . Such a literal result would be at war with the Congressional intent to permit pen registers. . . . So construed, Section 605 does not forbid the pen registers at issue here. A search warrant supported by probable cause is a 'demand of other lawful authority' within exception (6)."); Note, The Legal Constraints Upon the Use of the Pen Register as a Law Enforcement Tool (1975) 60 Cornell L.Rev. 1028, 1036.)

In spite of these prior pronouncements, clause 1 of Section 605 should not be read to prohibit the use of pen registers. Congress intended that once amended, Section 605 would act as a substitute provision for its pre-1968 predecessor. (" . . . This section is not intended merely to be a reenact-

ment of section 605. The new provision is intended as a substitute." [1968] U.S.Code Cong. & Admin.News, at p. 2196.) Thus, the authority of those cases that suggest that clause 1 prohibits pen registers is diminished.

When Congress amended Section 605 in Title III of the Omnibus Crime Control Act, it included within the same Title a wholly new statutory scheme for the interception and disclosure of wire communications (*i. e.,* 18 U.S.C. §§ 2510–2520). The legislative history of these new provisions clearly evidences Congress' intent to permit pen registers. (" . . . The proposed legislation is not designed to prevent the tracing of phone calls. The use of a 'pen register,' for example, would be permissible." Senate Report in [1968] U.S.Code Cong. & Admin. News at p. 2178.) In concluding that the new statute would not prohibit pen registers, Congress must have assumed that their use was also permissible under the older statute.[3] Additionally, Congress wanted to Omnibus Crime Control Act to take over the regulation of wire communication interceptions and electronic surveillance.[4] (*See Falcone, supra,* at p. 482 ("[T]he legislative history of the 1968 Amendment to § 605 reveals that Congress intended to shift all control of electronic surveillance operations to 18 U.S.C. §§ 2510–2520."); *Korman, supra,* at p. 932.) This intent would be thwarted if clause 1 of Section 605 were interpreted to apply to pen registers.

Finally, the cases that have prohibited pen registers have, for the most part, arisen in the context of criminal prosecutions for acts totally unrelated to the delivery of telephone service. These cases typically in-

---

3. If this were not the case, Congress would have, at the very least, included a citation to Section 605 to indicate that Section 605 was still available to attack pen registers. The Senate Report's reference to *Dote* following its language permitting the use of pen registers under the Omnibus Crime Control Act does not alter this conclusion. *Dote* clearly has no continued vitality under the amended clause 2 to Section 605. Nor does *Dote* discuss the applicability of clause 1 to pen registers.

4. The dissent distinguishes between the Omnibus Crime Control Act and Section 605 by arguing that the former statute deals with eavesdropping by interceptions while the latter is concerned with the divulgence of information regardless of how the information is obtained. The distinction is unsound. The second clause of Section 605 still deals with interceptions, albeit only of radio communications. And the Omnibus Crime Control Act, as well as Section 605, prohibits the disclosure of certain wire communications. (*See* 18 U.S.C. § 2511(1)(c).)

volve the telephone company's use of a pen register at the request of the Government to aid in the Government's investigation of crimes that do not relate to the telephone company's delivery of service to its customers. We are not faced with such a case in the present appeal.

From the infant years of Section 605 on, courts have recognized exceptions to the prohibitions in both clauses 1 and 2 of Section 605 where the telephone company has confined its use of the pen register to protecting itself against fraud or abuse of its facilities. (*See United States v. Goldstein* (9th Cir. 1976) 532 F.2d 1305, 1309 (". . . Despite these restrictions [*i. e.,* Section 605's] . . . it was held in a number of cases that § 605 did not prohibit a telephone company from monitoring its own lines to protect the integrity of its regular billing."); *Bubis v. United States* (9th Cir. 1967) 384 F.2d 643, 648 ("We do not believe that in the enactment of Section 605 . . . Congress intended to deprive communications systems of their fundamental right to take reasonable measures to protect themselves and their properties against the illegal acts of a trespasser.").) Indeed, at its

inception, Section 605 was drafted "to protect the integrity of communications systems[.]" (*Bubis,* at p. 646.) Included within this integrity is the obligation of the telephone company to shield its customers from the abuse of their telephone service by those who make obscene telephone calls. It is noteworthy that the customer was the paramount concern of Congress in drafting both versions of Section 605. (*See United States v. Russo* (E.D.Pa.1966) 250 F.Supp. 55, 58 ("The purpose of section 605 is to prohibit blatant public or private encroachments on the privacy of messages and the integrity of communication systems." (footnote omitted)).) With such a birthright, it would be anomalous indeed if Section 605 were interpreted to deprive a victim of obscene telephone calls of the very same protection Section 605 permits the telephone company itself to use against loss of profits.[5]

## II

I cannot join in the reasoning of Part I of Judge Renfrew's opinion. I assume, *arguendo,* that appellant can show the requisite governmental action to state a claim

---

**5.** My brothers criticize my reference to those cases in this Circuit that have exempted from Section 605's prohibitions the use of pen registers to detect billing fraud. They argue that we should not expand 18 U.S.C. § 2511(2)(a)(i) (1977) or the rationale of *Bubis* to permit a telephone company's investigation of obscene telephone calls because such an expansion would also condone a telephone company's investigation of extortion and like crimes. First, my discussion of the billing fraud cases is not intended to be interpretative of Section 2511(2)(a)(i) or of *Bubis* and its progeny. It is offered merely to support, by way of analogy, my conclusion that Section 605 does not prohibit the use of a pen register in the present suit. Our task is one of interpretation and my inclusion of the billing fraud cases requires us seriously to question any interpretation of Section 605 that would empower a telephone company to use a pen register to protect its bank account, but not to protect its customers against obscene telephone calls.

Second, my brothers envision a parade of horribles marching to the tune of my *"dictum."* Their concern is misplaced. A telephone user is not remediless against a telephone company turned private investigator. Part II of my opinion carefully preserves an injured customer's remedies under the aegis of the Fourth Amend-

ment if a telephone company uses pen registers to assist the police in the investigation of non-service related crimes. While making obscene telephone calls may be a crime, it also threatens the quality of the telephone company's delivery of service (*i. e.,* a victim may, as a result of receiving such calls, refuse to pick up his telephone or may discontinue service altogether). Thus, in contrast to those situations where the use of a telephone merely supplies the jurisdictional component for the application of a federal criminal statute, a telephone company has an interest to protect when a telephone is used to make obscene telephone calls. Nor does the opinion threaten the validity of a customer's remedy under 42 U.S.C. § 1983 (1974) or under the rationale of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* (1971) 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 if, assuming the appropriate governmental participation is present, the telephone company uses a pen register to investigate non-service related crimes. Furthermore, one injured by the disclosure of information gleaned from the over-zealous use of a pen register may still have a remedy against the telephone company under state law for unprivileged invasion of privacy.

for relief under Section 1983; we reach the constitutional issue only because we conclude that appellee's installation of a pen register does not transgress any federal statutory prohibition. In my view, the employment of a pen register in the present case does not constitute a search within the meaning of the Fourth Amendment because the "electronic listening" does not encroach upon "the privacy upon which . . . [one] justifiably relie[s]". (*Katz v. United States* (1967) 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576; *United States v. Baxter* (9th Cir. 1973) 492 F.2d 150, 167.)

A pen register records the numbers dialed from a particular telephone. It does not disclose the contents of any conversation nor does it indicate whether any calls were completed. So described, a pen register tape contains similar information to that which is recorded by the telephone company for purposes of billing toll calls. In *Baxter, supra,* we upheld the disclosure of telephone company billing records against a Fourth Amendment challenge. We noted that there was no justifiable expectation of privacy in the contents of these records: "Telephone subscribers are fully aware that records will be made of their toll calls. . . This Court has held that the expectation of privacy protected by the Fourth Amendment attaches to the content of the telephone conversation and not to the fact that a conversation took place." (*Id.* at p. 167. *See also United States v. Fithian* (9th Cir. 1971) 452 F.2d 505, 506 (". . . No one justifiably could expect that the fact that a particular call was placed will remain his private affair when business records necessarily must contain this information."

(footnote omitted)).) Similarly, there is no expectation of privacy in the contents of a pen register tape. Like billing records, a pen register tape discloses the numbers dialed from a particular telephone and not the contents of any conversation. In fact, a pen register creates a lesser intrusion into a subscriber's privacy because, unlike billing records, a pen register tape does not indicate whether any calls were answered.

True, the telephone company usually does not keep a record of local telephone calls. But most subscribers are unaware of the boundaries of their local dialing zones, especially in cities where these zones do not coincide with traditional geographic boundaries. Furthermore, it is common practice for the telephone company to keep a record of all calls dialed from a telephone which is subject to a special rate structure. (*See* 60 Cornell L.Rev. at p. 1045, n.96.) Under these circumstances, subscribers do not harbor any justifiable expectation of privacy that a record will not be kept of their outgoing calls.[6] (*See United States v. Clegg* (5th Cir. 1975) 509 F.2d 605, 610 (". . . The Fourth Amendment . . protects only the content of a telephone conversation and not the fact that a call was placed or that a particular number was dialed. . . . This is so because telephone subscribers have no reasonable expectation that records of their calls will not be made. It is, in fact, well known that such records are kept. . . . For this reason, the acquisition . . . by means of a pen register . . . of nothing more than information concerning . . . the numbers dialed does not offend the Fourth Amendment.").)[7]

The main issue in those cases was whether the Government could use a court order to force the telephone company to assist the Government in its investigation of non-service related crimes.

---

**6.** Our conclusion is not altered by the holdings in *Application of the United States for an Order Authorizing Installation and Use of a Pen Register v. Southwestern Bell Telephone Company* (8th Cir. 1976) 546 F.2d 243, *cert. petition filed* (February 22, 1977) 45 U.S.L.W. 3638, and *Application of the United States In the Matter of an Order Authorizing the Use of a Pen Register or Similar Mechanical Device* (2d Cir. 1976), *supra.* In those cases, the issue of whether the use of a pen register constitutes an unconstitutional search under *Katz* never arose because the Government had procured a court order to install the pen register prior to its attachment.

**7.** To the extent that Judge Renfrew implies that today's holding with respect to the legality of pen registers under the Fourth Amendment extends to the question of the constitutional validity of a TTS 176 device or a "snifter", it is impermissible *dictum.*

The decision in this case is a narrow one. We do not hold that information recorded by pen registers is never entitled to Fourth Amendment protection. Rather, our holding that the telephone company's use of a pen register to investigate obscene telephone calls does not violate the Fourth Amendment is limited to the facts presented by this appeal. We leave for another day a Fourth Amendment challenge to the telephone company's installation of a pen register at the request of the Government to investigate a crime that is unrelated to the delivery of telephone service.

MERRILL, Circuit Judge, concurring and dissenting:

I concur in part II of Judge Renfrew's opinion and agree with the conclusion of part I of that opinion and part II of Judge Hufstedler's concurring opinion. I disagree with the result they reach and with their conclusion that § 605 does not prohibit the divulgence of information obtained by means of a pen register. Accepting at face value the language of that section, it clearly does prohibit such divulgences. Subject to certain exceptions the prohibition, as applied to persons engaged in forwarding communications, is complete and absolute: "[N]o person * * * shall divulge or publish the existence, contents, substance, purport, effect, or meaning" of communications.

It is important to bear in mind that while Title III of the Omnibus Crime Control Act and § 605 both strive to protect interests of privacy and confidentiality, their objectives are quite different. Title III is concerned with eavesdropping—the obtaining of private information by unjustified intrusion into private areas. It seeks to accomplish its objective by regulating the interception of communications. The specific interest addressed by § 605 is the integrity of communications systems and companies engaged in forwarding communications. The section deals with situations in which the overhearing of private matters and the obtaining of information respecting the communications of others may be entirely prop-

er and even unavoidable. It does not seek to protect against the *obtaining* of information, but against the *divulging* of information.

Accordingly, I quite agree with Judge Renfrew and Judge Hufstedler that § 605 does not prohibit or regulate the use of pen registers. It does not prohibit or regulate *any* form of interception. I part company with them when they reason from this that § 605 does not (despite its forthright language) prohibit the *divulgence of information* obtained by means of a pen register. Their result would prohibit those in the designated class of telephone company employees from divulging information obtained by any other means, while leaving them entirely free to divulge to the next-door neighbor or to the world at large any information obtained by means of a pen register.

Judge Renfrew's conclusion that § 605 does not apply to pen registers is based on two propositions: (1) that the first clause of old § 605 before the 1968 amendment did not proscribe the divulgence of information obtained from a pen register; and (2) that on amendment in 1968 the language of the first clause (retained in the first sentence of the new § 605) carried with it its limited meaning. I cannot agree with either proposition.

Judge Renfrew's proposition 1 reasons that since the second clause of old § 605 was specifically addressed to "interceptions" (and the term "interceptions" in old § 605 included the use of pen registers), the only interpretation of the first clause that would give it independent significance is one that excludes interceptions. Judge Renfrew thus concludes that old clause 1 did not cover the divulgence of information obtained by means of interception including pen registers.

I do not find this construction of old clause 1 necessary if that clause is to have independent significance. The scope and breadth of its language proscribed *all* disclosures (by certain persons with certain exceptions) of the existence and content of communications, whether that information was obtained by interception or other

means. Clause 1 did overlap clause 2. Where the persons addressed by the first clause—those who receive, transmit, or assist the reception or transmission of communications—obtained information by means other than interception, then they could, with or without the sender's authorization, divulge the information to certain persons or under certain circumstances.[1] But where the persons addressed by the first clause obtained information by interception, then the second clause served in the nature of a proviso to add proscriptions to those imposed by the first clause—to proscribe *any* divulgence of information unless authorized by the sender.

The result is that under old § 605 divulgence of information obtained by use of a pen register was doubly proscribed: by both the first and second clauses; in each case, however, with differing conditions and exceptions. This might have amounted to a degree of redundancy, but I do not find that so objectionable as to justify a strained reading of clause 1's straightforward and comprehensive language.

Assuming, however, that old clause 1 is to be read as being inapplicable to pen registers or other interceptions, I cannot agree with Judge Renfrew's proposition 2: that the language of clause 1, which became the first sentence of new § 605, continued to retain that meaning following amendment. As noted by Judge Renfrew, legislative history discloses that new § 605 "is not intended merely to be a re-enactment of [the old § 605]. The [new] provision is intended as a substitute." S.Rep. No. 1097, 90th Cong., 2d Sess. 107, *reprinted in* [1968] U.S.Code Cong. & Admin.News 2112, 2196. Since the new § 605 is not a re-enactment of the old, in our construction of the new we start afresh, unhampered by restrictions that may have attached to the old for reasons other than its language, unless those reasons apply with equal force to the new. With clause 2 stricken from § 605 by amendment the only reason for giving the language of clause 1 a narrow reading is gone. We need no longer struggle to give it some significance independent of that which is no longer there. There is now no occasion for construing it otherwise than in light of what it actually says.

None of the cases on which Judge Renfrew relies supports the proposition that § 605 permits *disclosure* of information obtained by means of a pen register. Not one of the cases so holds. Instead, they deal with the legality of the *use* of the device.[2]

Judge Renfrew also cites a Senate Report that states "[t]he regulation of the interception of wire or oral communications in the future is to be governed by [Title III]." S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.

---

1. I think note should be taken of the extraordinarily inept draftsmanship of § 605. The "exceptions" are not stated as exceptions at all. Quite to the contrary, the section as drawn explicitly forbids divulgence to the very persons who, one would reasonably suppose, should have the information divulged to them. When the section was amended in 1968, thirty-four years after this language was first used, the sense (or nonsense) of the original language was meticulously preserved, word for word, and the fact that it was intended to mean exactly what it said is strongly suggested by the fact that the numerals (1) through (6) were added to the original language to replace the word "or," thus lending emphasis to the point that (2) through (6) were to serve the same function as (1). Nevertheless, *United States v. Finn*, 502 F.2d 938, 942–43 (7th Cir. 1974), sensibly held that this apparently deliberate perpetuation of forthright language should not preclude the courts from striving to write sense into the section by recognizing that what is stated as a prohibition was intended to be a statement of an exception to the prohibition. All other courts faced with the problem seem tacitly to have agreed with that result.

2. In *United States in re Order Authorizing Use of a Pen Register*, 538 F.2d 956, 958 (2d Cir. 1976), *cert. granted*, 429 U.S. 1072, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977), the court held that a court order authorizing use of a pen register was not forbidden by § 605. In *United States v. Falcone*, 505 F.2d 478, 482 (3d Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975), the precise holding was that § 605 does not prohibit the use of pen registers. The same was true of *United States v. Brick*, 502 F.2d 219, 223 (8th Cir. 1974), and *Korman v. United States*, 486 F.2d 926, 931–32 (7th Cir. 1973).

News 2112, 2196. But as part II of Judge Renfrew's opinion points out, Title III uses the term "interception" specifically to refer to the aural acquisition of the contents of communications. When the Senate Report says that "interceptions" will be regulated by Title III, it must be referring to the special meaning given that term in Title III itself.

Judge Hufstedler notes that under *Bubis v. United States,* 384 F.2d 643 (9th Cir. 1967), an exception to the proscription against interception is recognized to permit a telephone company to investigate fraudulent circumvention of its billing procedures. Since *Bubis* speaks in terms of protection of the integrity of communications systems (384 F.2d at 646) she reasons that included within this exception should be action taken to protect customers from the intrusion of obscene telephone calls. I cannot agree.

When § 605 was amended in 1968 Congress preserved (in 18 U.S.C. § 2511(2)(a)(i)) the judicially created exception for telephone company investigations of fraud against its property. *United States v. Clegg,* 509 F.2d 605, 613 (5th Cir. 1975). Congress did not further encourage telephone companies to conduct self-authorized criminal investigations.[3] To expand this limited exception to § 605 to include investigations of misuse of company facilities by obscene telephone calls would invite including investigations of misuse by extortion, threat or other crimes directed against a telephone subscriber. The statutory exception should not, in my view, be broadened to include areas other than those in which the company is acting in self-defense. The privacy interest that § 605 is designed to protect is the privacy of the communication and not the privacy of the listener upon whom an unwelcome communication has intruded.

Nor can I agree with the district court (see note 2 of Judge Renfrew's opinion) that the divulgences here were not violations of § 605 under the holdings of *Bubis v. United States, supra,* and *United States v. Baxter,* 492 F.2d 150, 165–66 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). Both cases held that § 605 did not apply since the persons who there did the divulging in question were not engaged in "receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio." In *Bubis,* the person divulging was a special agent of a telephone company in charge of "investigation of the manufacture, use and sale in the Los Angeles area of an instrument and device known as a multifrequency generator." 384 F.2d at 646. Similarly in *Baxter,* the evidence did not indicate that the divulgence of information obtained from telephone company toll and billing records was done by any of the persons addressed by clause 1. I do not question *Bubis* or *Baxter,* but I see no reason to extend their holdings beyond their facts.[4] Here, one of those divulging was a company foreman in charge of maintenance and repair of equipment and thus regularly engaged in assisting in the transmitting and receiving of communications. Since his duties involved the testing of equipment he could be said to fall within the class of employees likely to overhear communications in the course of their em-

---

**3.** Congress intended "to reflect existing law." S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, 2112, 2182. The Senate Report's example of "existing law" was *United States v. Beckley,* 259 F.Supp. 567 (N.D.Ga.1965) which, like *Bubis,* involved a telephone company investigation of persons who were attempting to defraud the company with respect to long distance calls.

Since the amendment of § 605, courts have not chosen to broaden this narrowly intended exception. *See, e. g., United States v. Goldstein,* 532 F.2d 1305, 1311 (9th Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976); *United States v. Glanzer,* 521 F.2d 11, 12 (9th Cir. 1975).

**4.** The precise holding of *Bubis* was that the information sought to be suppressed *should* have been suppressed as the result of interception and divulgence in violation of clause 2 of old § 605. The portion of the opinion holding that the divulger did not fall within the class specified in clause 1 was not in response to a claim that the divulgence violated that clause. Instead, it was in response to the appellant's claim that he was, under that clause, authorized to divulge in response to a subpoena.

ployment. The fact that he may at the moment have been assigned to assist special security agents does not serve to remove him from the class of employees subject to the proscription of § 605.

I might add that my result would not unduly hamper police investigation by eliminating the possibility of telephone company cooperation. The only impediment faced by the police is that they may not secure information from the company without order or subpoena.

For these reasons I would hold that § 605 does apply to information obtained by means of a pen register. I would reverse summary judgment and remand for further proceedings.